IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO. MEO1353173.20,** <br><br> Plaintiff, <br><br> *v.* <br><br> **PEERSTAR, LLC,** <br><br> Defendant. | **CIVIL ACTION** <br><br> **NO. 22-1300-KSM** |

## MEMORANDUM

**Marston, J.**                                                                                      **January 9, 2023**

      Plaintiff Certain Underwriters at Lloyd's, London, subscribing to Policy No. 1353173.20 ("Underwriters"), seeks a declaratory judgment that the Policy's Sexual Abuse/Misconduct Sublimit applies in an underlying state court action in which Underwriters is currently defending Defendant Peerstar, LLC ("Peerstar"). In the state court action one of Peerstar's former clients who was sexually abused by a Peerstar employee brings claims against Peerstar for negligent hiring and supervision, negligent performance of an undertaking to render services, and respondeat superior. (Doc. No. 1.) Peerstar filed a declaratory judgment counterclaim, seeking the opposite: a declaration that the Policy's Sexual Abuse/Misconduct Sublimit does not apply to the underlying litigation. (Doc. No. 6.)

      Presently before the Court is Underwriters's motion for judgment on the pleadings (Doc. Nos. 13, 14), and Peerstar's cross-motion (Doc. No. 15). For the reasons that follow, the Court grants Underwriters's motion and denies Peerstar's cross-motion.

## I.     Background

The material facts of this case are undisputed.

### A. *The Sharretts Action*

Jonathan Sharretts is the plaintiff in the underlying state court action. When Sharretts was six years old, a court ordered that his grandmother, Joyce Sharretts, become his legal guardian. (Sharretts Compl. at ¶ 9.) Sharretts's grandmother, whom he called "Aunt Joyce," arranged for Plaintiff to receive mental health care and assistance for his bipolar, depression, ADHD, and severe anxiety attacks. (*Id.* at ¶ 10.)

In late winter or early spring 2017, when Sharretts was 17 years old, he began attending a Peer Drop-In Center located in Johnstown, Pennsylvania. (*Id.* at ¶ 11.) Sharretts was approached by Kevin Ritko, a Certified Peer Specialist employed by Peerstar.[1] (*Id.*) Ritko told Sharretts that he wanted to be his mentor and drove Sharretts to Peerstar's Richland Township office. (*Id.*) While parked, Ritko began stroking and caressing Sharretts's leg in an unwelcome sexual manner. (*Id.*) Sharretts resisted, Ritko stopped, and then Ritko entered the office building and returned shortly thereafter. (*Id.*)

About a week later, Sharretts again encountered Ritko at the Drop-In Center and Ritko directed Sharretts to get into his car again. (*Id.* at ¶ 12.) Ritko told Sharretts that he was taking him for pizza and to "talk about what's going on in your life. I can help." (*Id.*) Instead, Riko drove Sharretts to Rager's Mountain, a mountain which was located just beyond the West End

---

[1] Peerstar is engaged in the business of providing professional advice and peer support services to those who need assistance in adapting to the activities and demands of daily living. (*Id.* at ¶ 3.) According to Peerstar's website, Certified Peer Specialists are "self-identified consumers of behavioral health services. They are specially trained and maintain a certification to provide peer support services. They provide an environment of empathy and understanding through lived experiences and support others through their journey of recovery." (*Id.* at ¶ 6.)

section of Johnstown. (*Id.*) Ritko, "a burly man weighing well over 200 pounds," locked the car doors, leaving Sharretts, who was only 110 pounds at the time, with "a bad feeling in his stomach" and unable to escape. (*Id.* at ¶ 13.) Ritko performed oral sex on Sharretts and then drove him back to the Drop-In Center. (*Id.*) Ritko told Sharretts he could not tell anyone what happened or else Ritko would severely harm Sharretts's sister and grandmother. (*Id.*)

For months, Ritko took Sharretts to Rager's Mountain and sexually abused him. (*Id.* at ¶ 14.) Sometimes Ritko's significant other, Joseph Melling, would accompany them and sexually abuse Sharretts as well. (*Id.*)

Sometime after Sharretts's eighteenth birthday in May 2017, Ritko forced Sharretts to move into his residence in Johnstown to minimize the risk of being discovered on Rager's Mountain and to facilitate his and Melling's access to Sharretts. (*Id.* at ¶ 17.) Ritko provided Sharretts with drugs, money, and alcohol. (*Id.* at ¶ 18.) Ritko warned Sharretts that if he told anyone about the sexual abuse, Sharretts would be arrested for illegal drug use and Ritko would hurt him, his sister, and grandmother. (*Id.*)

Near the end of June, Sharretts was formally assigned to Ritko and placed under Ritko's supervision and mentorship as a Certified Peer Specialist. (*Id.* at ¶ 16.)

In mid-November 2017, Sharretts informed his grandmother of the abuse and she contacted the police. (*Id.* at ¶ 19.) On July 31, 2018, the Johnstown Police Department filed a Criminal Complaint against Ritko, charging him with numerous counts of rape, sexual assault, and related offenses. (*See id.* at ¶ 20; Lloyd's Compl. at ¶ 18.) In October 2020, Ritko pled guilty to an aggravated indecent assault charge. (Lloyd's Compl. at ¶ 19.)

In January 2022, Sharretts filed a complaint against Peerstar in the Court of Common Pleas of Cambria County, asserting claims for negligent hiring and supervision (Count I),

negligent performance of an undertaking to render services (Count II), and employer responsibility for employee actions (respondeat superior) (Count III).  (Sharretts Compl. at ¶¶ 24–42.)

   *B.  The Policy*

Underwriters issued an Insurance for Outpatient Mental Healthcare Professionals Policy (Policy No. ME01353173.20), with a policy period of May 29, 2020 to May 29, 2021, to Peerstar.  (*See* Lloyd's Compl. at ¶ 22; Doc. No. 1, Ex. B (the Policy).)  According to the Declarations, for Professional Liability ("PL") claims, the Policy had a $1,000,000 limit, and for sexual abuse/misconduct claims, the Policy had a $100,000 sublimit.  (*See* Doc. No. 1, Ex B at HISCOX000002.)

The Coverage Part of the Policy states:

> **We** will pay up to the **coverage part limit** for **damages** and **claim expenses** in excess of the **retention** for covered **claims** against **you** alleging a negligent act, error, or omission in **your counseling services** performed on or after the **retroactive date**, including but not limited to:
>
>   1.  breach of any duty of care;
>
>   2.  **bodily injury**; or
>
>   3.  **personal and advertising injury**,
>
> provided the **claim** is first made against **you** during the **policy period** and is reported to **us** in accordance with Section V. Your obligations.

(*Id.* at HISCOX000010.)  "For purposes of th[e] Coverage Part, **you**, **your**, or **insured** means a **named insured**, **employee**, **independent contractor**, **student**, or **medical director**."  (*Id.* at HISCOX000011.)

The Sexual Abuse/Misconduct Sublimit, which is located under the Coverage Enhancements subheading in the Policy, provides:

> **We** will pay **damages** and **claim expenses** up to the limit stated in the Declarations for any **claim** against **you** alleging sexual misconduct, sexual abuse, physical abuse, or child abuse, provided the **claim** is first made against you during the policy period, it arises from **your counseling services** performed on or after the **retroactive date**, and it is reported to us in accordance with Section V.

(*Id.* at HISCOX000010–11.)

In turn, Endorsement 11 of the Policy amended the definition of "counseling services" to mean "outpatient mental health services including: 1. Applied Behavioral Analysis; 2. substance abuse counseling; 3. Partial hospitalization or Intensive Outpatient Programs; 4. remote therapy; or 5. any other services identified as Covered Professional Services under the Outpatient Mental Healthcare Professional Liability Coverage Part section of the Declarations." (*Id.* at HISCOX000033.) The Policy's Declaration lists "Covered Professional Services" as "Solely in the performance of mentoring services provided by Certified Peer Counselors." (*Id.* at HISCOX000002.)

Section II.B. of the General Terms and Conditions of the Policy, Limits of Liability, provides:

> The Each Claim Limit identified in the Declarations is the maximum amount **we** will pay for all **covered amounts** for each covered **claim**, unless a lower sublimit is specified, in which case the sublimit is the maximum amount **we** will pay for the type of covered **claim** to which the sublimit applies. . . .

(*Id.* at HISCOX000005.) The Limits of Liability also states:

> All **related claims**, regardless of when made, will be treated as one **claim**, and all subsequent **related claims** will be deemed to have been made against you on the date the first such **claim** was made. If, by operation of this provision, the claim is deemed to have been made during any period when **we** insured **you**, it will be subject to only one **retention** and one Each Claim Limit regardless of the number of claimants, **insureds**, or **claims** involved.

(*Id.*) "Related claims" is then defined as "all claims that are based upon, arise out of, or allege":

5

    1. a common fact, circumstance, situation, event, service, transaction, cause, or origin;

    2. a series of related facts, circumstances, situations, events, services, transactions, sources, causes, or origins;

    3. a continuous or repeated act, error, or omission in the performance of your professional services; or

    4. the same breach, event, occurrence, or offense.

(*Id.* at HISCOX000009.)

### C. Procedural History

On April 4, 2022, Underwriters—which is currently defending Peerstar in the underlying state court action, with a full reservation of rights—filed this lawsuit seeking a declaration that the $100,000 Sexual Abuse/Misconduct sublimit applies. (Doc. No. 1.) Peerstar filed its answer and a counterclaim, seeking a declaratory judgment that the Sexual Abuse/Misconduct Sublimit does not apply, on August 24, 2022. (Doc. No. 6.) Subsequently, Underwriters filed the instant motion for judgment on the pleadings (Doc. Nos. 13, 14), Peerstar filed a cross-motion (Doc. No. 15), and Underwriters filed a reply (Doc. No. 16).

## II. Legal Standards

### A. Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment on the pleadings is appropriate if "the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988)). A dispute of fact is material if there is sufficient evidence for a reasonable factfinder to find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).² When determining whether the moving party is entitled to judgment as a matter of law, the Court must view the facts in the light most favorable to the non-moving party. *Rosenau*, 539 F.3d at 221; *Shelly v. Johns-Manville Corp.*, 798 F.2d 93, 97 n.4 (3d Cir. 1986). "In deciding a motion for judgment on the pleadings, a court may consider 'the pleadings and attached exhibits, undisputedly authentic documents attached to the motion for judgment on the pleadings if plaintiff's claims are based on the documents, and matters of public record.'" *Burlington Ins. Co.*, 484 F. Supp. 3d at 240 (quoting *Atiyeh v. Nat'l Fire Ins. Co. of Hartford*, 742 F. Supp. 2d 591, 595 (E.D. Pa. 2010)).

"The interpretation of an insurance contract is a question of law." *Atain Ins. Co. v. E. Coast Business Fire, Inc.*, Civil Action No. 17-2545, 2018 WL 637579, at *1 (E.D. Pa. Jan. 31, 2018) (citing *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011)). "Whether a claim is within a policy's coverage or is barred by an exclusion may be determined on a motion for judgment on the pleadings." *Id.*; *see also Leithbridge Co. v. Greenwich Ins. Co.*, 464 F. Supp. 3d 734, 738 (E.D. Pa. 2020) ("The interpretation of an insurance policy is a question of law. Courts may therefore dispose of such cases on motions for judgment on the pleadings where the sole issue is the interpretation of the policy." (cleaned up)).

### B. Contract Interpretation

Under Pennsylvania law, "[c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement." *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008) (alteration in original) (quoting *Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped*, 886 A.2d 706,

---

² Although *Anderson* defined materiality in the context of a motion for summary judgment, courts have applied this definition when reviewing a motion for judgment on the pleadings. *See, e.g.*, *Burlington Ins. Co. v. Shelter Structures, Inc.*, 484 F. Supp. 3d 237, 240 & n.17 (E.D. Pa. 2020).

711 (Pa. Commw. Ct. 2005)); *see also Pa. Env't Def. Found. v. Pennsylvania*, 255 A.3d 289, 304 (Pa. 2021). Courts applying Pennsylvania law are required to give effect to a contract's clear and unambiguous language. *401 Fourth Street, Inc. v. Invs. Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005); *see also Wilson v. Hartford Cas. Co.*, 492 F. Supp. 3d 417, 426 (E.D. Pa. 2020). A contract's terms "are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999); *see also Atain*, 2018 WL 637579, at *2 ("Contract language is ambiguous if it is reasonably capable of more than one meaning."). However, courts must not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity," and must give effect to a contract's clear and unambiguous terms. *Madison Constr. Co.*, 735 A.2d at 106; *see also Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005) ("In construing the policy, if the words of the policy are clear and unambiguous, the court must give them their plain and ordinary meaning. . . . Ambiguous terms must be strictly construed against the insurer, but the policy language must not be tortured to create ambiguities where none exist."). "The mere fact that the parties do not agree on the proper construction does not make a contract ambiguous." *See Pacific Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012) (citing *Metzger v. Clifford Realty Corp.*, 476 A.2d 1, 5 (Pa. Super. Ct. 1984)).

### III.     Discussion

Underwriters argues that it is entitled to a declaratory judgment that the Sexual Abuse/Misconduct Sublimit applies to the underlying state action, meaning that the maximum coverage available under the Policy for that lawsuit is $100,000. We agree. The plain language of the Policy states that Underwriters "will pay **damages** and **claim expenses** up to the limit stated in the Declarations for any **claim** against **[Peerstar]** alleging sexual misconduct, sexual

abuse, physical abuse, or child abuse, provided the **claim** . . . arises from **[Peerstar's] counseling services**[.]" (Doc. No. 1, Ex. B at HISCOX000010.)  In turn, the Declarations provide for a $100,000 limit for Sexual Abuse/Misconduct claims.  (*Id.* at HISCOX00002.)  At base, the underlying litigation stems from Ritko's sexual misconduct, which occurred in the context of Ritko serving as Sharretts's mentor; but for Ritko sexually abusing Sharretts, Sharretts would not have sued Ritko's employer, Peerstar, for its negligence.  (*See, e.g.*, Sharretts Compl. at ¶ 26 ("Notwithstanding Defendant's negligence in failing to test, evaluate, investigate and screen Ritko before and after he was placed in charge of a vulnerable young adult, Defendant could have prevented the almost daily rapes, batteries and sexual assaults perpetrate by Ritko (and later Melling) on Plaintiff had it exercised reasonable supervisory practices."), ¶ 31 ("Peerstar's negligent and reckless hiring and failing to effectively supervise Peerstar employee, Ritko, permitted him, or failed to prevent him from engaging in egregious conduct involving the Plaintiff who became a victim of multiple rapes and sexual assaults over a span of more than six months[.]").)  Accordingly, the Court finds that the Sexual Abuse/Misconduct Sublimit applies.

Peerstar contends that the Sexual Abuse/Misconduct Sublimit does not apply to claims sounding in negligence.  (*See* Doc. No. 15 at 7–10.)  Peerstar does not cite to any provision in the Policy—and this Court has not found any—that supports that proposition.  And to bolster its position that the allegations in this case sound entirely in negligence (and that therefore the sublimit should not apply), Peerstar cites to a 1998 Pennsylvania Superior Court case, *Board of Public Education of School District of Pittsburgh v. Nation Union Fire Insurance Company of Pittsburgh*, 709 A.2d 910 (Pa. Super. Ct. 1998), in which the school district claimed that the insurer owed it a duty of defense in an underlying case brought against the school district by a minor who was sexually molested by the president of a parent-teacher organization.  *See id.* at 911–12.  In its

analysis, the Pennsylvania Superior Court rejected the insurer's argument that certain exclusions in the policy applied and found that the insurer owed a duty of defense, reasoning that the allegations against the school district were grounded in negligence, not criminal activity or assault and battery. *See, e.g.*, *id.* at 914–15 ("Exclusion (a) deals with claims 'involving . . . criminal acts.' . . . The claim against the School District 'involves' criminal acts, in that it is alleged that its negligence allowed Walls' criminal acts to occur, and that [the minor] suffered thereby. However, the criminality alleged is one party removed from the insured; it is not alleged the claim involved the criminality by the insured School District itself. . . . Allowing the insurer to deny a defense against claims sounding entirely in negligence to an entire roster of law-abiding people and groups because of alleged criminality by a single 'volunteer' cannot be what the parties bargained for."); *id.* at 916 ("Exclusion (b) excuses coverage for claims 'arising out of . . . assault and battery.' The injuries arise . . . from the School District's negligent acts and omissions; the omissions and negligence (the 'claim') did not arise from the molestation. . . . Walls' acts alone do not create or give rise to a claim against appellants; that claim cannot stand on allegations of assault alone. It arises, if at all, from other facts, grounded in negligence.").

The language of the Sexual Abuse/Misconduct Sublimit is unlike the language in those exclusions. (*Compare* Doc. No. 1, Ex. B at HISCOX000010, with *Board of Public Education*, 709 A.2d at 914–15.) And, in any event, at least one judge in this District has disregarded *Board of Public Education of School District of Pittsburgh* because it pre-dated the Pennsylvania Supreme Court's decision *Madison Construction Co. v. Harleysville Mutual Insurance Co.*, 735 A.2d 100 (Pa. 1999). *See Leithbridge v. Greenwich Ins. Co.*, 464 F. Supp. 3d 734, 741 (E.D. Pa. 2020) (holding that the underlying litigation was within the scope of an exclusion, that the insurer did not owe the insured a duty of defense, and rejecting the insured's reliance on *Board of Public*

*Education*, because it "predate[d] *Madison*" and the court "must follow *Madison*'s clear rule"). In *Madison*, the underlying plaintiff sued his employer (the insured) for negligence after he inhaled hazardous fumes at his employer's construction site, passed out and fell into a pit, and injured himself. 735 A.2d at 102. The insurer determined that a policy exclusion for bodily injury "arising out of" the release of pollutants applied, and denied coverage. *Id.* at 102–03. The insured disagreed, arguing that the underlying complaint "stated claims for acts of alleged negligence, such as failure to warn, which did not arise out of [its] use of pollutants." *Id.* at 109. The Pennsylvania Supreme Court sided with the insurer and found that the exclusion applied, reasoning: "All of the plaintiff's claims of negligence . . . rest upon the fundamental averment that 'while Mr. Ezzi attempted to set up an exhaust fan for the fumes emanating from the curing agent, he suddenly and without warning was overcome by fumes, causing him to become dizzy and pass out.' In other words, . . . the plaintiff's injuries 'arose out of' the release of the irritating fumes at the construction site. *Id.* at 109–110.

Again, nothing in the Policy states that negligence claims are excluded from the purview of the Sexual Abuse/Misconduct Sublimit. Although, unlike *Madison*, the instant case does not involve policy exclusions, this Court finds the *Madison* court's reasoning persuasive, and it leads us to reject Peerstar's argument that the underlying claims sound entirely in negligence and the Sexual Abuse/Misconduct Sublimit does not apply. Like in *Madison*, where the claims of negligence were not "truly independent of the insured's use of a pollutant," Sharrett's claims of negligence against Peerstar are not truly independent of Ritko's sexual abuse and misconduct. *Id.* at 109.

*Leithbridge* is also instructive. In *Leithbridge*, the underlying complaint alleged that Leithbridge (the insured) enabled the thefts of hundreds of thousands of dollars by negligently

11

safeguarding its clients' personal information, and Leithbridge wanted its insurer to defend and indemnify it. 464 F. Supp. 3d at 736. The insurer refused, relying on a policy exclusion for claims "based on or arising out of the conversion . . . misappropriation, or improper use of funds." *Id.* The court agreed with the insurer that the claim was based on, and arose out of, the alleged conversion and therefore fell within the exclusion. *Id.* at 740–41. Analogizing to *Madison*, the court reasoned: "Here, Leithbridge is arguing, just like the insured in *Madison*, that the underlying action arises out of its 'negligence.' But, just like the pollutant release was unavoidably a basis of the underlying plaintiff's personal injury claim in *Madison*, the alleged theft of the closing funds is unavoidably a basis of the Underlying Plaintiffs' claim here." *Id.* at 740. The same is true here—Sharretts's negligence claims against Peerstar are unavoidably tethered to, and based on, Sharretts's allegations of sexual abuse and misconduct, which arose out of Sharretts's interactions with Ritko in Ritko's capacity as Sharretts's mentor/Peer Specialist at the Peer Drop-In Center.

Peerstar's other arguments are equally unavailing. Peerstar asserts that the Sexual Abuse/Misconduct Sublimit does not apply to Count III of the underlying complaint, which is a respondeat superior claim (*see* Doc. No. 1, Ex. B, Count III ("Employer Responsibility for Employee Actions (Respondeat Superior)"); *id.* at ¶ 41–42)). (*See* Doc. No. 15 at 15 ("Count III does not allege sexual misconduct by Peerstar (vicariously or otherwise) as Underwriters suggest."); *id.* (arguing that the sublimit is "ambiguous with respect to whether it applies to vicarious liability claims").) But this argument is neither here nor there and Count III should not even be considered, as it cannot stand for a separate reason—namely, respondeat superior is *not* an independent cause of action. *See, e.g.*, *Niblett v. eXP Realty, LLC*, 1:21-CV-01345, 2022 WL 4348452, at *10 (M.D. Pa. Sept. 19, 2022) ("Courts have explained that there is no independent cause of action for respondeat superior under Pennsylvania law. Because there can be no

standalone claim for respondeat superior, this count will be dismissed with prejudice*.")*; *Khawaja v. Bay Mgmt. Grp., LLC*, Civil Action No. 22-182, 2022 WL 1308508, at *3 (E.D. Pa. May 2, 2022) (granting motion to dismiss "vicarious liability/respondeat superior" count because "there is no independent cause of action for respondeat superior or vicarious liability under Pennsylvania law" (cleaned up)).

Next, Peerstar argues that the Sexual Abuse/Misconduct Sublimit is a separate insuring agreement and "nothing in the Policy" suggests that that agreement "limits the coverage provided by the Policy's primary insuring agreement for negligence claims." (*See* Doc. No. 15 at 13.) In other words, Peerstar contends that the Sexual Abuse/Misconduct Sublimit provides *extra* coverage, *on top of* the professional liability coverage that applies to negligence claims, relying on the "Coverage Enhancement" title under which the sublimit falls. (*See id.* at 12–13 ("The Policy provides coverage for negligence claims pursuant to the following insuring agreement . . . . The Policy provides coverage for sexual abuse claims pursuant to a separate insuring agreement that the Policy describes as a coverage enhancement[.]"); *id.* at 13 ("[T]he fact that the Policy describes the insuring agreement for sexual abuse claims as a 'coverage enhancement' strongly suggests that it supplements or enhances the coverage provided by the insuring agreement for negligence claims.").) The Court finds Peerstar's reliance on the title's language to be misplaced.

The Policy explicitly states, "Titles of sections and endorsements to this policy are inserted solely for convenience of reference and will not be deemed to limit, expand, or otherwise affect the provisions to which they relate." (*Id.* at HISCOX000008.) Further, the Sexual Abuse/Misconduct Sublimit is clearly labeled a "sublimit" (*see id.* at HISCOX000010), and the sublimit states, "You must pay the retention stated in the Declarations in connection with

any payment we make under this subsection C [the sublimit], and any payments we make will be a part of, and not in addition to, the coverage part limit" (*id.*). The Policy also states that "Each Claim Limit identified in the Declarations is the maximum amount we will pay for all covered amounts for each covered claim, *unless a lower sublimit is specified, in which case the sublimit is the maximum amount we will pay for the type of covered claim to which the sublimit applies. The Each Claim Limit, or sublimit, will be a part of, and not in addition to, any applicable coverage limit*" and "[a]ll related claims, regardless of when made, will be treated as one claim" (*id.* at HISCOX000005 (emphasis added)). Further, the Declarations page states that sexual abuse/misconduct claims will have a "$100,000 aggregate limit (Shared Limit with PL)." (*Id.* at HISCOX000002.) In arguing that the Sexual Abuse/Misconduct Sublimit should be considered a supplement to the professional liability coverage, Peerstar asks us to ignore the plain language of the Policy and the Policy's many other relevant provisions and instead to read the "Coverage Enhancement" title in a manner that contradicts the rest of the contract's provisions. We will not do so.[3] *See Pacific Employers Ins. Co.*, 693 F.3d at 426 ("When determining whether a contract is ambiguous, we must 'examine the entire contract' and 'particular words should be considered, not as if isolated from the context, but rather, in the light of the obligation as a whole and the intention of the parties as manifested thereby.' In this regard, 'all provisions in the agreement will be construed together and each will be given effect' because a court 'will not interpret one provision . . . in a manner which results in another portion being annulled.'" (citations omitted)).

      Further, Peerstar argues that "[i]f Underwriters truly intended the Sexual Abuse Sublimit

---

[3] As Peerstar notes in its sur-reply (Doc. No. 17 at 5), the section begins with the statement, "We will also make the following payments." (Doc. No. 1 at 39.) The Court is not persuaded that the word "also" is dispositive. The plain language of "also" means that the Policy's coverage had other provisions, not that the sublimits listed below were on top of or in addition to the overall coverage.

to apply to claims sounding in negligence that allege sexual abuse by another party, Underwriters should have used policy language similar to the standard ISO [Insurance Services Offices] abuse or policy language that has been used by insurers for more than 30 years." (Doc. No. 15 at 12.) This argument is meritless. As noted above, "[i]n deciding a motion for judgment on the pleadings, a court may consider 'the pleadings and attached exhibits, undisputedly authentic documents attached to the motion for judgment on the pleadings if plaintiff's claims are based on the documents, and matters of public record.'" *Burlington Ins. Co.*, 484 F. Supp. 3d at 240 (quoting *Atiyeh* v, 742 F. Supp. 2d at 595). The standard ISO abuse or policy language is not mentioned anywhere in the Policy or the pleadings. It is irrelevant what other type of language other insurers have used in other cases in the past; what matters is the language of the contract at issue in this case. *See 4431, Inc. v. Cincinnati Ins. Cos.*, 504 F. Supp. 3d 368, 381 (E.D. Pa. 2020) ("Under Pennsylvania law, 'contract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties *as embodied in the written agreement*. Courts assume that a contract's language is chosen carefully and that the parties are mindful of the meaning of the language used. *When a writing is clear and unequivocal, its meaning must be determined by its contents alone*.'" (emphases added) (citations omitted)).

Last, Peerstar argues that Underwriters's proposed interpretation of the Sexual Abuse/Misconduct Sublimit is inconsistent with the Policy's intentional acts exclusion. (Doc. No. 15 at 14.) The intentional acts exclusion in the Policy states:

> **We** will have no obligation to pay any sums under this Coverage Part, including any **damages** or **claim expenses**, for any **claim** or other matter: . . . 14. Based upon or arising out of any actual or alleged fraud, dishonesty, criminal conduct, or any knowingly wrongful, malicious, or intentional acts or omissions, except that:
>
> > a. **we** will pay **claim expenses** until there is a final

>>adjudication establishing such conduct; and

>>b. this **exclusion** will not apply to otherwise covered intentional acts or omissions resulting in **personal and advertising injury**.

>This exclusion will apply to the **named insured** only if the conduct was committed or allegedly committed by any:

>>i. partner, director, officer, or member of the board (or equivalent position) of the **named insured**; or

>>ii. employee of the **named insured** if any partner, director, officer, member of the board (or equivalent position) of the **named insured** had reason to know of such conduct by the employee.

>This exclusion will apply separately to each **insured** and will not apply to any **insured** who did not commit, participate in, acquiesce to, or ratify such conduct committed by another **insured**.

(Doc. No. 1, Ex. B at HISCOX000012, HISCOX000014.) Peerstar does not explain how this exclusion is inconsistent with the Sexual Abuse/Misconduct Sublimit (*see* Doc. No. 15 at 14), or otherwise show that the intentional acts exclusion is applicable to the issues currently before this Court.

* * *

In sum, the language in the Policy is clear: the Sexual Abuse/Misconduct Sublimit applies because Sharretts allegations that Peerstar behaved negligently are based on allegations of Ritko's sexual abuse of Sharretts, which arose when Peerstar provided a counseling service to Sharretts. The Policy is not reasonably susceptible to multiple interpretations, and the Court rejects Peerstar's attempts to create ambiguity where there is none.

### IV. Conclusion

For the foregoing reasons, the Court grants Underwriters's motion for judgment on the pleadings and denies Peerstar's cross motion. An appropriate Order follows.